**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

                           **Plaintiff,**

             **v.**                                      **11-CR-155A**

**JOSEPH G. MARCHESE,**

                           **Defendant.**
_____

## REPORT, RECOMMENDATION AND ORDER

            This case was referred to the undersigned by the Hon. Richard J. Arcara,

in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report

upon dispositive motions.


## PRELIMINARY STATEMENT

            The defendant, Joseph G. Marchese ("the defendant"), is charged in a

two count indictment with unlawful manufacture of 50 or more marijuana plants, a

Schedule I controlled substance in violation of Title 21 U.S.C. Sections 841 (a)(1) and

(b)(1)( c ), Count 1; and unlawful use of premises for the purpose of manufacturing,

distributing and using marijuana, a Schedule 1 Controlled substance, in violation of Title

21 U.S.C. Section 856 (a)(1), Count 2. (Dkt.#1).


            The defendant has filed a motion requesting suppression of evidence

seized from his home at 181 Center Street, Lackawanna, N.Y. on May 3, 2006 as well

as statements made by him to law enforcement agents. (Dkt.#6).

He also seeks to have the indictment dismissed because of the government's delay in "bringing the action."  (Dkt. #6, p. 7).

An evidentiary hearing was held by this Court on January 4, 11 and February 8, 2012. Thereafter, transcripts of the proceedings were filed on April 4, 2012. (Dkt.#s 10, 11, and 12).

## DISPUTED FACTS[1]

Because the material facts in this case are substantially disputed or contradicted, I have taken the liberty of setting out in relevant detail the testimony of Jaime Lake, Officers Chuck Jaworski and Christopher Caber of the Lackawanna Police Department and the defendant, Joseph Marchese, as it relates to the initial entry and search of the defendant's premises at 181 Center Street, Lackawanna, New York by the police officers on May 3, 2006 for purposes of deciding the defendant's motion to suppress the evidence seized from his home as a result of that entry and search as well as the suppression of his statements and/or admissions to Officer Jaworski and S.A. Fitzpatrick.

_____

[1] The facts are taken from the transcripts of the proceedings of January 4, 2012, January 11, 2012 and February 8, 2012.  References to the proceedings appear as T1 (January 4, 2012, Dkt.#10),T2 (January 11, 2012, Dkt.#11) and T3 (February 8, 2012, Dkt.#12) followed by the appropriate page number(s).

**Testimony of Jaime Lake:**

Mr. Lake testified that in the early morning hours of May 3, 2006, he flagged down a Lackawanna Police car on Maple Grove Street in the City of Lackawanna, New York and spoke to police officers Jaworski and Caber. He told the officers "that he had just been thrown out and [he] wanted [his] belongings out of the premises" where he had been living at 181 Center Street in Lackawanna, New York. He also stated "that there was some suspicious activity going on in the kitchen [of those premises]" and that "it looked like a nursery" and "it looked like [marijuana]." (T3, pp. 6-7, 21, 26, 28-29). The police officers agreed to drive him to the premises at 181 Center Street and assist him in retrieving his belongings from that premises which he shared with the defendant.

Lake testified that upon entering the police car, Officer Jaworski made a call for assistance of other police officers. (T3, p. 7).

Officers Jaworski and Caber drove Lake to the defendant's residence at 181 Center Street, Lackawanna, New York and advanced to the front door entry to the premises. Lake could not recall whether he had his key to the premises and tried to enter with the police officers standing along side him or whether he gave his key to Officer Jaworski and he either was in the squad car or standing on the front lawn while the officers were knocking on the front door. (T3, pp. 24-25). According to Lake, Officer Jaworski "bang[ed] on the door and request[ed] the [defendant] to open the

-3-

door" and continued banging on the door for "a few minutes" and "yelling to open up the door. (T3, pp. 8, 30-31). When the defendant opened the door, "Officer Jaworski entered the house first" and "the other cop may have entered second." (T3, p. 9). Lake could not recall whether the defendant told the officers to come in or not. Nor could he recall whether the defendant told the officers that they could not come into the premises. (T3, pp. 5-6, 26).

Lake "didn't see anything" when the officers entered the defendant's residence since he believed he remained outside and he did not know how far the officers entered into the premises. (T3, p. 10). When he did finally enter the premises for purposes of retrieving his belongings, "the officers were everywhere: kitchen, livingroom" since "more officers had arrived at this point." (T3, pp. 10-11). He was in the premises for approximately thirty seconds. (T3, pp. 10-11). Subsequently, Officer Jaworski drove him to his mother's house "within a few minutes after he left the apartment" with his belongings. (T3, p. 11).

Later that morning on May 3, 2006, Lake went to Lackawanna Police Headquarters and gave a sworn statement describing the events that previously occurred on May 3, 2006 which was reduced to writing and signed by him. (*See* Government Exhibit 1) (T3, pp. 11-12, 14-15).

In his signed sworn statement of May 3, 2006 (Government Exhibit 1), Lake stated that he "told Officer Jaworski that [he] was concerned about getting [his]

-4-

clothes and that [the defendant] might have been growing marijuana.  Officer Jaworski

then asked for back up" and then asked Lake "how many plants [the defendant] was

growing and [he] told Officer Jaworski that there was (sic) more than a few.  Officer

Jaworski asked [him] what kind of plants they were and [he] told him that [he] assumed

that they were marijuana plants."


### Testimony of Officers Chuck Jaworski and Christopher Caber:

On May 3, 2006, Officer Chuck Jaworski of the Lackawana Police

Department was on patrol duty with his partner Christopher Caber when they were

flagged down by Jaime Lake at approximately 4:45 - 5:00 a.m.  Lake told him that "he

was involved in a verbal altercation earlier in the day, which turned physical, with his

roommate with whom he lived at 181 Center Street," Lackawanna, New York.  Lake told

him that he had left the residence but that he "wanted to go back home, retrieve some

belongings so he could go to sleep at his mother's residence which was also in the City

of Lackawanna."  Lake said "he was afraid to go back to the residence" and "he didn't

want another verbal argument and/or physical argument with his roommate."  Lake

"asked [the officers] if [they] could please assist him, go with him back to his residence

so he could retrieve his belongings that he needed and there would be no altercation

with his roommate."  (T1, pp. 11-12, 93-95)**.**


Both Officer Jaworski and Officer Caber denied that Jaime Lake said

anything to them about marijuana plants or "what he had seen" at the defendant's

house.  T1, pp. 27, 33, 106).  Officer Jaworski also could not recall whether he asked

for "backup" before they went to the defendant's residence (T1, p. 32) but Officer Caber

testified that they did not call for "backup" before they went to the defendant's

residence.  (T1, pp. 106-107).

Officers Jaworski and Caber agreed to escort Lake to his residence at 181

Center Street, Lackawanna, New York.  Both police officers and Lake walked up to the

front door of the residence.  There were two locks on the front door of the residence.

Lake had a key which unlocked one of the locks but he could not unlock the second

lock which he claimed "was never locked" and that "his roommate must have locked

him out."  Lake began knocking on the door and the officers "could see somebody

through the lighted windows moving around inside the residence."  After approximately

"a minute of knocking, the roommate ("the defendant") did come to the door" and

opened it.  (T1, pp. 13-14, 95-97, 124-125).

When the door was opened, the officers "asked if [they] could come in the

residence" and that they "were just [there] to diffuse any problem" and that "Mr. Lake

just wanted his belongings."  (T1, pp. 15-16, 97).

Officer Jaworski testified that the defendant told them to "come in."  (T1,

pp. 41-43).  Officer Caber testified that the defendant never told them that they could

not come into the premises.  (T1, pp. 125-126).  The officers entered the premises

through the front door which immediately led into the living room of the residence.

-6-

(T1, pp. 16, 98).  Officers Jaworski and Caber stated that they observed a coffee table located "within five feet of the door from where [they] were standing" and on that coffee table they observed an open cigar box in which they "could see clear plastic sandwich bags which had greenish vegetation, which appeared to be marijuana.  The bags were rolled up" and "were kind of in a cigar shape, but larger."  (T1, pp. 16-17, 98, 117).

Officer Jaworski also testified that "as soon as the front door opened, [he] could smell the strong odor of presence (sic) of marijuana in that residence."  (T1, p. 17).  Officer Caber also stated he detected a "strong odor of marijuana."  (T1, pp. 98-99).  Officer Jaworski asked the defendant "if that was in fact marijuana there on the table" and after a moment, the defendant replied, "yeah, that is marijuana" and that it was for his "personal use."  (T1, pp. 17-18).  Officer Jaworski then proceeded to enter into the living room for the purpose of "retriev[ing] that marijuana" and in doing so, he "could see clearly from the living room into the kitchen.  In the middle of the kitchen was a kitchen table" and "on top of that kitchen table was a plastic tote" containing "three lines of plants" which "appeared to be marijuana plants."  Officer Jaworski "could smell the marijuana in the residence."  (T1, p. 18).  Officer Jaworski asked the defendant "if he was, in fact, growing marijuana" and the defendant allegedly replied that he was. (T1, p. 18).

After Officer Jaworski determined that the plants in the kitchen were marijuana plants, he asked the defendant "if there was (sic) any more plants in the residence" to which the defendant allegedly replied, "yes there is."  (T1, p. 19).  When

Officer Jaworski asked the defendant where those plants were, the defendant stated "they're in the back bedroom" which was off the kitchen.  (T1, pp. 19-20).  Officer Jaworski observed a "padlock on the top of [the bedroom] door which was not locked, it was open."  (T1, p. 20).  The defendant removed the lock and opened the bedroom door "to show [the officer] where those plants were in that room."  When Officer Jaworski entered the room he observed that "the room was full of plants" numbering approximately sixty (60) plants.  The bedroom also contained "fans, artificial lighting elements, bags of fertilizer, and a lot of different pots and soils."  (T1, p. 20).

As a result of observing the large quantity of marijuana plants and growing materials in the bedroom, Officer Jaworski contacted Detective Paul Sojda of the Lackawanna Narcotics Office who "agree[d] to come in early to take over that investigation and that scene."  Agents from the DEA were also called to the location.  (T1, pp. 20, 100).  Officer Jaworski told the defendant "that the detective from Narcotics was on his way down there" and that the defendant had "to remain [there] until he was talked to by Detective Paul Sojda.  (T1, p. 21).  At no time did Officer Jaworski advise the defendant of his rights or give him *Miranda* warnings, and he did not hear anyone else give *Miranda* warnings to the defendant.  (T1, pp. 22, 83).  He also admitted that the defendant was not free to leave "after the initial marijuana was found on the table in the living room" as he "walked through the [entrance] doorway.  (T1, p. 83).  Officer Jaworski also testified that the statements made to him by the defendant and recorded in Government Exhibit 1 were made "within five minutes of [his] entering that residence" and after he had observed the contraband on the living room table.  (T1, p. 86-88).

A police report was filled out along with a Notice To Defendant Of Intention To Offer Evidence At Trial under Sections 710.30 and 700.70 of the New York Criminal Procedure Law ("CPL") wherein it is stated that the defendant stated to Officers Jaworski, M. Gawronski and Caber that "[he] has been growing the stuff (marijuana) for about one year" and that "it's better than the stuff from Canada or anything commercially.  There is nothing drying now, it's not in that cycle yet - I grow this stuff for myself."  (*See* Government Exhibit 1).

Nowhere in the Police Report nor in the Notice To Defendant (Government Exhibit 1) is there an indication that the defendant was advised of his rights or given a *Miranda* warning.  The Police Report does indicate that at least four Lackawanna Police Officers were at the premises of 181 Center Street and involved in the arrest of the defendant, namely Officers Jaworski, Caber, Gawronski and Swiech. (Government Exhibit 1).

**Testimony of Special Agent ("SA") Fitzpatrick:**

SA Fitzpatrick of the DEA testified that he and a number of other DEA agents arrived at 181 Center Street, Lackawanna, New York on May 3, 2006 at approximately 10:00 a.m.  (T2, pp. 4-5, 12).  Upon arrival he observed hydroponic growing equipment, live marijuana plants, some marijuana paraphernalia  - - water pipe, some other items of that nature; growing lights, growing medium and trays for irrigation."  (T2, p. 5).  The defendant was still present at this time.  (T2, p. 7).

DEA Task Force Officers transported the defendant to the DEA office where S.A. Fitzpatrick "read him his Miranda warnings off the DEA card provid[ed] to [him] at the DEA Academy."  (T2, p. 8-9).  The defendant acknowledged that he "understood his rights" and "indicated he was willing to answer questions."  (T2, p. 9).  S.A. Fitzpatrick asked the defendant "whose marijuana was it and where the equipment came from."  The defendant told him that the marijuana "was his" and that "some of [the equipment] was from Harvest Moon Hydroponics."  (T2, p. 9).

**Testimony of the Defendant, Joseph Marchese:**

The defendant testified that Jaime Lake had been living with him at his residence located at 181 Center Street, Lackawanna, New York for approximately six months prior to May 2-3, 2006 and that he had directed Lake to vacate his premises on May 2-3, 2006.  (T2, p. 105).

On May 3, 2006 at approximately 5:00 a.m., he heard someone "trying to open the [front] door" and he "seen (sic) the handle jiggling."  (T2, p. 83).  He thought it was his "roommate [Lake] trying to get in."  When he arrived at the front door of his residence he "seen (sic) the keys (sic) get in the lock and turn it, so [he] turned it back" because he "didn't want to let the person in" whom he assumed was his roommate Lake because Lake, earlier, "ran off with the key that was sitting on the [kitchen] counter."  (T2, p. 84).  He then put the deadbolt lock on because Lake did not have a key for that lock on the door since he did not want to let Lake into his apartment.  (T2,

pp. 84-85).  He could hear "someone on the other side" of the door and "assumed that [Lake] brought the police with him" because he "started seeing flashlights in the window."  (T2, p. 85).  He then knew that Lake brought the police with him and "the police said they brought [Lake] there to get his belongings."  (T2, pp. 127-128).

Because he had marijuana growing in his apartment, the defendant "went over to the kitchen and took [his] tie-dye blanket and covered up the marijuana."  (T2, p. 85).  However, after covering the plants with the blanket, the plants "started bending down" and the blanket "bent the stakes and everything and the plants a little bit" and the stakes fell.  (T2, p. 87).  He denied that the cigar box containing marijuana was visible "before the officers came into [his] apartment."  (T2, p. 88).  It was only after he hid these items that he went to the front door and "asked who was it."  (T2, pp. 88-89).  "Probably five minutes" elapsed from the time Lake attempted to unlock the door and when the defendant finally opened the door.  (T2, 109, 110).  It was during this five minute period that he "spent some time hiding the grow, hiding the marijuana under the couch, etc., making sure nothing was out in the open" and "stashing [his] drugs, stashing [his] bong, stashing the tray with the knife on it and the scissors, covering up the marijuana that's growing on the kitchen table."  (T2, pp. 109-111, 123).

After asking "who was it," they answered police and he asked "what do you want?"  They responded that they "want[ed] to get Jaime Lake's clothes" and told him that "if [he didn't open the door, [they were] going to break it in."  (T2, p. 89).  The

police did not ask if they could come in when he opened the door, and he denied inviting them in.  (T2, pp. 133-134).

The defendant waited and "thought about it for a little bit and then said, 'okay, I'll let Jaime in, but you guys got to stay outside'."  (T2, pp. 89, 133).  He told the officers that he would open the door "if they were to wait outside and Jaime [could] get his belongings."  (T2, pp. 109, 114).  The police "might have said okay" to this directive.  (T2, pp. 114-115).

The officers told him to "turn on the lights," and after he opened the front door, "they proceeded to come in through [him]."  The defendant told them "you're not supposed to be in here" but the officers "kept on looking around" and "open things."  The defendant told them to leave and "kept on saying loud and clear that "I don't want you in my apartment, you said you would stay outside."  (T2, p. 91).

After the police officers entered the living room of his apartment, he tried to prevent them from entering the kitchen by "standing at the door" and continued to tell them they were "not supposed to be in here, would you officers leave."  (T2, p. 91).  The officers observed another door in the kitchen with a latch and lock on it (*see* Defendant's Exhibits I and J) and asked the defendant "what was behind the door" to which the defendant responded, "nothing."  The officers said "open the door or else we're going to break it down."  As a result, the defendant unlocked the door.  (T2, pp. 91-92).

The defendant also claimed that the officers were "going through [his] property" and "going through his house."  (T2, p. 93).  They also asked him if the marijuana in the house was his, and he admitted it was and told them it was "for [his] personal use."  (T2, p. 93).  At no time was he given any *Miranda* warnings by any of the police officers in his house.  (T2, p. 139).

Later that day when the defendant was taken to the DEA office, S.A. Fitzpatrick gave him *Miranda* warnings by reading from a card.  (T2, pp. 95-96, 139-140). After receiving the *Miranda* warnings from S.A. Fitzpatrick, he "repeated the same statements he had given to the officers from Lackawanna earlier."  (T2, p. 140).  He did this because the police officers had already found the marijuana and, therefore, he was just "repeating the same thing" he had already told the officers.  (T2, pp. 95-96).

## DISCUSSION AND ANALYSIS

In support of his motion to suppress use of evidence seized from his home on May 3, 2006, the defendant argues that the Lackawanna police officers who initially entered his premises on May 3, 2006 did so without his consent and without a search warrant in violation of his rights under the Fourth Amendment to the United States Constitution.  (Dkt. #6, pp. 4-6).

In opposition to the defendant's position, the government asserts that the officers were allowed into the premises at 181 Center Street, Lackawanna, New York

on May 3, 2006 by the defendant, and after having been so invited in, they observed the contraband in question.  The government argues that since the defendant "consented" to the entry into his home by the police officers, the subsequent observation of contraband and the seizure of same was lawful and not in violation of the defendant's Fourth Amendment rights.

The defendant also argues that all of the incriminating statements made by him to law enforcement officers must be suppressed since such statements "flow[ed] from the illegal warrantless search and seizure of the marijuana plants and therefore are tainted, requiring suppression."  (Dkt. #6, p. 6).  He also argues that his "statements should be suppressed because they were made without benefit of *Miranda* warnings and while being held inside his home when he was not free to leave."  (Dk. #6, pp. 6-7).

In response to this argument, the government states that "regardless of whether the defendant was Mirandized prior to making those incriminating statements, the defendant was subsequently Mirandized by Special Agent (SA) Matthew Fitzpatrick of the DEA and thereafter parroted the same statements concerning ownership of the marijuana plants, etc."  (Dkt. #7, p. 3).

Lastly, the defendant has asserted a claim that "the case should be dismissed" because he has been "prejudiced by the government's delay in bringing the action, even though the Indictment had been returned within the statute of limitations period."  (Dkt. #6, p. 7).

The government responds by stating that the defendant "has not articulated, nor is it obvious that he has suffered any prejudice by the government's delay in bringing this action" and therefore, "no dismissal is warranted."  (Dkt. #7, p. 3).

Each of the aforesaid issues will be separately addressed herein.

## A.      The Entry Into And Search of the Premises

The Fourth Amendment to the United States Constitution expressly provides that:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

As the United States Supreme Court has ruled:

> The Fourth Amendment protects the individual's privacy in a variety of settings.  In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated."  That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  Silverman v. United States, 365 US 505, 511, 5 L Ed 2d 734, 81 S Ct 679, 97 ALR2d 1277.  In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 589-590 (1980); *Kirk v. Louisiana*, 536 U.S. 635, 636 (2002).

The Supreme Court further ruled that "it is a basic principle of Fourth Amendment Law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton* at 586. This principle has been reiterated numerous times by various courts as reflected by the Second Circuit Court of Appeals' decision in *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) wherein the Court stated:

> Subsequent holdings have reiterated that principle and "made clear that any physical invasion of the structure of the home, 'by even a fraction of an inch,' [i]s too much to be tolerated. *Kyllo v. United States*, 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). We believe it is clear that by stepping into the house, Gorman crossed *Payton's* "firm line" and implicated its protections. No invasion of the sanctity of the home can be dismissed as *de minimis*. "'A sane, decent, civilized society must provide some . . . oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.'" *Silverman*, 365 U.S. at 511 n. 4, 81 S.Ct. 679 (quoting *United States v. On Lee*, 193 F.2d 306, 315-16 (2d Cir. 1951) (Frank, *J.*, dissenting)); *see Kyllo*, 533 U.S. at 37, 121 S.Ct. 2038 ("[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the non-intimate rug on the vestibule floor.").

In defining the purpose of the Fourth Amendment, the Supreme Court has stated:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.  Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.  Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing.  The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.  When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

*Johnson v. United States,* 333 U.S. 10, 13-14 (1948).

However, "it is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause [under the Fourth Amendment] is a search that is conducted pursuant to consent" so long as that consent is "voluntarily given."  *Schneckloth v. Bustamonte*, 412 U.s. 164, 165-166 (1974).  This principle was reaffirmed by the United States Supreme Court in *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

The burden of establishing the validity of a "consent to search" is upon the government.  *Schneckloth, supra* at 222; *Bumper v. North Carolina*, 391 U.S. 543, 548

(1968); *Florida v. Royer*, 460 U.S. 491, 497 (1983) (*plurality opinion)*.  In meeting its burden of establishing that a consent to search was validly given, the government need only show by a preponderance of the evidence that the consenting party freely and voluntarily gave his consent to search.  In this regard, the credibility of the witnesses is a question for the judge who heard them.  *United States v. Miley*, 513 F.2d 1191, 1201 (2d Cir.); *cert. denied*, 423 U.S. 842 (1975).

In determining whether a consent to search is valid or not, the "totality of the circumstances must indicate that it was voluntarily given."  *United States v. Davis*, 967 F.2d 84, 86 (2d Cir.), *cert. denied by Content v. United States*, 506 U.S. 928 (1992), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249 (1973); *United States v. Isofia*, 370 F.3d 226, 231 (2d Cir. 2004); *United States v. London*, 148 Fed. Appx. 19, 22 (2d Cir. 2005).  Stated another way, a determination must be made as to whether, under a totality of the circumstances, "the consent was a 'product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.'" *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (internal citations omitted).

Jaime Lake, a so-called neutral witness, testified that when he initially flagged down Officers Jaworski and Caber, he told them "that there was some suspicious activity going on in the kitchen" of the premises located at 181 Center Street, Lackawanna, New York and that "it looked like a nursery" and "it looked like

[marijuana]."  T3, pp. 6-7, 26, 28-29).  He also testified that upon entering the police

car, Officer Jaworski made a call for assistance of other police officers.  In his signed,

sworn statement of May 3, 2006 (Government Exhibit 1), Lake reiterated that he "told

Officer Jaworski that [he] was concerned about getting [his] clothes and that [the

defendant] might have been growing marijuana.  Officer Jaworski then asked for

backup" and then asked Lake "how many plants [the defendant] was growing and [he]

told Officer Jaworski that there was (sic) more than a few.  Officer Jaworski asked [him]

what kind of plants they were and [he] told him that [he] assumed that they were

marijuana plants."  (T3, p. 7).


If the only purpose in driving Jaime Lake to 181 Center Street,

Lackawanna, New York was to enable him to obtain his belongings from the premises,

this Court has trouble in understanding why it would be necessary for Officer Jaworski

to call for "backup" by other police officers.  Lake also testified that "more officers had

arrived" at 181 Center Street on May 3, 2006" and that "the officers were everywhere:

kitchen, livingroom."  (T3, pp. 10-11). The Lackawanna Police report corroborates this

testimony in that it lists police officers Jaworski, Caber, Swiech and Gawronski as

having been at the scene and involved in the arrest of the defendant.  (Government

Exhibit 1).  The Notice To Defendant Of Intention To Offer Evidence At Trial, Sections

710:30 CPL and 700.70 CPL (Government Exhibit 1) also indicates presence at the

scene by Officer Gawronski in addition to Officers Jaworski and Caber.

Although Officers Jaworski and Caber denied that Lake said anything to them about marijuana plants or "what he had seen" at the defendant's house (T1, pp. 27, 33, 106) and Officer Caber denied that a call for "backup" had been made before they went to the defendant's residence (T1, pp. 106-107), the contrary would seem to be the case.  How else did it come to be that Officer Swiech and Gawronski were at the premises and participated in the arrest of the defendant?

Lake further testified that when they arrived at the premises located at 181 Center Street, Lackawanna, New York, Officer Jaworski "bang[ed] on the door and request[ed] the [defendant] to open the door" and that Jaworski continued banging on the door for "a few minutes" and was "yelling to open up the door."  (T3, pp. 8, 30-31).

The defendant testified that he heard "someone trying to open the [front] door" and he "seen (sic) the handle jiggling."  (T2, p. 83).  He thought it was his "roommate [Lake] trying to get in."  He did not want to allow entry into his house by Lake and, therefore, he put the deadbolt on because Lake did not have a key for that lock.  (T2, pp. 84-85).  He also knew that the police were outside with Lake.  (T2, pp. 127-128).  "Probably five minutes" elapsed from the time Lake attempted to unlock the front door and when he finally opened the front door.  (T2, pp. 109, 110).  This five minute delay was used by the defendant for the purpose of hiding the various contraband in his apartment.  (T2, pp. 109-111, 123).  However, before opening the door, the defendant testified that he asked who was there and what did they want and

that the response was "police" and that they want[ed] to get Jaime Lake's clothes" and

that "if [he didn't open the door, [they were] going to break it in."  (T2, p. 89).

Although Officer Jaworski testified that Lake began knocking on the front

door and after approximately "a minute of knocking, the roommate [the defendant] did

come to the door and opened it, I find that the testimony of Lake as a neutral witness

corroborates the testimony of the defendant wherein he stated that Officer Jaworski

"bang[ed] on the door and request[ed] the [defendant] to open the door" and that

Jaworski continued banging on the door for "**a few minutes**" and was "**yelling to open

up the door**."  (T3, pp. 8, 30-31) (emphasis added).  This time element of a "few

minutes" is closer to the defendant's claim of "probably five minutes" elapsed before he

opened the door.  It also makes sense that some period of time was used by the

defendant after hearing Lake and the police at the door for the purpose of hiding the

contraband that was present in his apartment.  The "bang[ing]" and "yelling" by

Jaworski, as testified by Lake, lends credence to the defendant's claim that the police

threatened to "break the door down" if he did not open it.  Knowing that he had a house

full of growing marijuana plants as well as other contraband, the Court finds it difficult to

believe that the defendant quickly and voluntarily opened the front door and "invited"

the police in as testified to by Officer Jaworski.  Also, having observed the demeanor of

the defendant and having heard him articulate the events of May 3, 2006, it is the

opinion of this Court that the defendant is a reasonably intelligent person and

possessed sufficient faculties to tell the police, as he testified, that he would let Jaime Lake in but they had "to stay outside."  (T2, p. 89).

Officer Jaworski testified that when the door was opened by the defendant, he "asked if [they] could come in the residence" and that he told the defendant that they "were just [there] to diffuse any problem" and that "Mr. Lake just wanted his belongings"  (T1, pp. 15-16, 97) and that the defendant told them to "come in."  (T1, pp. 41-43).  Officer Caber testified that the defendant never told them they could not come into the premises.  (T1, pp. 125-126).  Both officers testified that immediately upon entering the premises, they observed what appeared to be marijuana and that they smelled a "strong odor of marijuana."  (T1, pp. 16-17, 98, 117).  In response to Officer Jaworski's questions, the defendant admitted that it was marijuana and that it was his for "personal use."  (T1, pp. 17-18).

Jaime Lake testified that although he could not recall one way or the other if anything was said by the police to the defendant or by the defendant to the police at the time the defendant opened the front door (T3, pp. 8, 25-26, 30-31), "Officer Jaworski entered the house first" and "there were other officers" present who also entered the house in addition to Officers Jaworski and Caber.  (T3, pp. 9, 28).

The defendant testified that notwithstanding his admonition to the police officers "to stay outside" when he opened the front door (T2, pp. 89, 133), "they proceeded to come in through [him]."  He continued to tell them that they were "not

supposed to be in [there]" and that they were to leave because he did "not want [them] in [his] apartment."  (T2, p. 91).  He continued to attempt to prevent the officers from entering the kitchen by "standing at the door" and continued to tell them that they were "not supposed to be in [there]" and he directed them to leave.  (T2, p. 91). Nevertheless, the police officers continued searching the premises.

There is no question that the home of the defendant was physically invaded by a number of police officers in the early morning hours of May 3, 2006 without the benefit of a search warrant.  When I consider the "totality of the circumstances" as evidenced by the testimony given in determining whether the "consent of the defendant" to enter his home was a "product of [his] free and unconstrained choice, rather than a mere acquiescence in a show of authority," I conclude that the government has failed to meet its burden of proof in that regard.  As a result, I conclude that "by stepping into [the defendant's] house," the police officers "crossed *Payton's* 'firm line' and implicated its protections."  *Loria v. Gorman, supra*.  It is therefore RECOMMENDED that defendant's motion to suppress use of the evidence seized from his home on May 3, 2006 be GRANTED.

### B.    The Statements Of The Defendant At 181 Center Street

#### 1.    Fruit of the Poisonous Tree:

Officers Jaworski and Caber testified that as soon as they entered the defendant's residence they observed a coffee table located "within five feet of the door

from where [they] were standing" and on that coffee table they observed an open cigar

box in which they "could see clear plastic sandwich bags which had greenish

vegetation, which appeared to be marijuana.  The bags were rolled up" and "were kind

of in a cigar shape, but larger."  (T1, pp. 16-17, 98, 117).

The observations and questions by officer Jaworski regarding the

contraband in the defendant's home were the result of an illegal entry in violation of the

Fourth Amendment as determined above by this Court.  At issue is the admissibility of

the statements of the defendant made to Officer Jaworski and as set forth in

Government Exhibit 1.

As the United States Supreme Court stated in *Wong Sun v. United States*,

371 U.S. 471 (1963):

> The exclusionary rule has traditionally barred from trial
> physical, tangible materials obtained either during or as a
> direct result of an unlawful invasion. It follows from our
> holding in *Silverman v. United States,* 365 U.S. 505, 81 S.Ct.
> 679, 5 L.Ed.2d 734, that the Fourth Amendment may protect
> against the overhearing of verbal statements as well as
> against the more traditional seizure of 'papers and effects.'
> Similarly, testimony as to matters observed during an
> unlawful invasion has been excluded in order to enforce the
> basic constitutional policies. *McGinnis v. United States, 1
> Cir., 227 F.2d 598.*  Thus, verbal evidence which derives so
> immediately from an unlawful entry and an unauthorized
> arrest as the officers' action in the present case is no less
> the 'fruit' of official illegality than the more common tangible
> fruits of the unwarranted intrusion.  *See Nueslein v. District
> of Columbia,* 73 App.D.C. 85, 115 F.2d 690.  Nor do the
> policies underlying the exclusionary rule invite any logical
> distinction between physical and verbal evidence. Either in

terms of deterring lawless conduct by federal officers, *Rea v. United States,* 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233, or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction.

*Id.* At 485-486.


Even if the statements and admissions of the defendant "were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains . . . *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment."  *Brown v. Illinois*, 422 U.S. 590, 602 (1975); *see also United States v. Trzaska*, 111 F.3d 1019 (2d Cir. 1997).


"The Wong Sun doctrine applies as well when the fruit of the Fourth Amendment violation is a confession."  *Oregon v. Elstod*, 470 U.S. 298, 306 (1985). Having found that the initial entry into the defendant's home by the police officers was in violation of the defendant's Fourth Amendment rights, I further find that his subsequent statements and admissions to those officers were "come at by exploitation of that illegality."  *Wong Sun, supra* at 488.  Therefore, it is RECOMMENDED that defendant's motion to suppress the use of his statements made to the Lackawanna Police officers and as set forth in Government Exhibit 1 be GRANTED.

## 2. Failure to Give Miranda Warnings to
## the Defendant - An Alternative Issue:

Officer Jaworski admitted that at no time did he or anyone else advise the defendant of his rights or give him Miranda warnings while he and the other officers were present at 181 Center Street on May 3, 2006.  (T1, pp. 22, 83).  He also testified that the defendant was not free to leave "after the initial marijuana was found on the table in the living room."  The admissions and statements of the defendant were made to him "within five minutes of [Jaworski's] entering that residence."  (T1, pp. 86-88).

In *Miranda*, the United States Supreme Court created a procedural mechanism with the purpose of establishing a prophylactic safeguard that would protect a defendant from the coercive nature of custodial interrogation and preserve his Fifth Amendment privilege against self-incrimination.  However, before the requirements of *Miranda* come into play, there must be a form of "custody" of the person to be interrogated which "custody" amounts to the deprivation of "freedom of action in any significant way."  *Miranda v.* Arizona, 384 U.S. 436, 444 (1966); *Thompson v. Keohane*, 516 U.S. 99, 100-101 (1995); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004).  The defendant bears the burden of proving custody.  *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984).  In making a determination of whether such "custody" existed, the Court must consider the totality of the circumstances.  *California v. Beheler*, 463 U.S. 1131, 1125 (1983).

> In determining whether a suspect was in custody, we look at all the circumstances surrounding the interrogation.   The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation."   Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151-52, 82 L.Ed.2d 317 (1984).   And custody exists for Miranda purposes if a reasonable person in that position would "have felt he or she was not at liberty to terminate the interrogation and leave."   Thompson, 516 U.S. at 112, 116 S.Ct. at 465. As the Second Circuit recently stated:

> The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.   An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave. United States v. Kirsh, 54 F.3d 1062, 1067 (2d Cir.) (internal quotation marks and citation omitted), cert. denied, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); see also United States v. Morales, 834 F.2d 35, 38 (2d Cir.1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

*Tankleff v. Senkowski, supra* at 243-244.

Based on the testimony received in the hearing, I find that the defendant was in "police custody" when Officer Jaworski began his "interrogation" of the defendant while going through the premises of the defendant at 181 Center Street.

> Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody. . . ."  Id., at 444, 16 L. Ed 2d 694, 86 C Ct 1602, 10 ALR3d 974.  The warning mandated by Miranda was meant to preserve the privilege during "incommunicado

interrogation of individuals in a police-dominated atmosphere." Id., at 445, 16 L Ed 2d 694, 86 S Ct 1602, 10 ALR3d 974.  That atmosphere is said to generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  Id., at 467, 16 L Ed 2d 694, 86 S Ct 1602, 10 ALR3d 974.  "Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated."  Berkemer v. McCarty, 468 US 420, 437, 82 L Ed 2d 317, 104 S Ct 3138 (1984).

*Illinois v. Perkins*, 496 U.S. 292, 296 (1990).

In defining the term "interrogation," the United States Supreme Court has instructed that:

the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.  A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.  But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis,* 446 U.S. 291, 301-302 (1990); *United States v. Montana*, 958 F.2d 516, 518-519 (2d Cir. 1992).

-28-

There can be no doubt that the questions posed by Officer Jaworski to the defendant were "reasonably likely to elicit an incriminating response from the [defendant]" and therefore, such questions constituted "interrogation" of the defendant, which under the circumstances at the time equated to "subtle compulsion."  It was certainly a "police-dominated atmosphere" as evidenced by the presence of a number of police officers in the defendant's home at 5:00 a.m.  (T3, pp. 10-11).  Since the defendant had not been advised of his rights nor given any warnings as required by *Miranda*, the statements and admissions made by the defendant in response to Officer Jaworski's interrogation were improperly obtained and it is therefore RECOMMENDED that the use of such statements at trial be suppressed.

### C.     The Statements Of The Defendant Given To S.A. Fitzpatrick:

SA Fitzpatrick of the DEA testified that he and a number of other DEA agents arrived at 181 Center Street, Lackawanna, New York on May 3, 2006 at approximately 10:00 a.m.  (T2, pp. 4-5, 12).  Upon arrival he observed hydroponic growing equipment, live marijuana plants, some marijuana paraphernalia  - - water pipe, some other items of that nature; growing lights, growing medium and trays for irrigation."  (T2, p. 5).  The defendant was still present at this time.  (T2, p. 7).

DEA Task Force Officers transported the defendant to the DEA office where S.A. Fitzpatrick "read him his Miranda warnings off the DEA card provid[ed] to [him] at the DEA Academy."  (T2, p. 8-9).  The defendant acknowledged that he

"understood his rights" and "indicated he was willing to answer questions."  (T2, p. 9).

S.A. Fitzpatrick asked the defendant "whose marijuana was it and where the equipment

came from."  The defendant told him that the marijuana "was his" and that "some of [the

equipment] was from Harvest Moon Hydroponics."  (T2, p. 9).

        The defendant testified that when he was taken to the DEA office on the

morning of May 3, 2006 after having been formally arrested, S.A. Fitzpatrick gave him

*Miranda* warnings by reading from a card.  (T2, pp. 95-96, 139-140).  After receiving the

*Miranda* warnings from S.A. Fitzpatrick, he "repeated the same statements he had

given to the officers from Lackawanna earlier."  (T2, p. 140).  He did this because the

police officers had already found the marijuana and, therefore, he was just "repeating

the same thing" he had already told the officers.  (T2, pp. 95-96).

        The government argues that after S.A. Fitzpatrick read the *Miranda*

warnings and advice of rights to the defendant, the defendant acknowledged that he

understood his rights and voluntarily waived them.  As a result, his admissions to the

questions put to him by S.A. Fitzpatrick are admissible and the defendant's motion to

suppress use of those statements at trial should be denied.

        The fact that the defendant had been given *Miranda* warnings and

advised of his rights by S.A. Fitzpatrick does not automatically cause the statements of

the defendant post *Miranda* to be admissible.

-30-

The United States Supreme Court has expressly stated that:

> The *Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment violation is a confession.  It is settled law that "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" Taylor v. Alabama, 457 US 687, 690, 73 L Ed 2d 314, 102 S Ct 2664 (1982) (quoting Brown v. Illinois, 422 US 590, 602, 45 L Ed 2d 416, 95 S Ct 2254 (1975)).

*Oregon v. Elstad*, 470 U.S. 298, 306 (1985).

The mere giving of *Miranda* warnings does not constitute "an intervening event [ ]" so as to "break the causal connection between the illegal" entry at 181 Center Street and the defendant's admissions to S.A. Fitzpatrick.  As the Supreme Court stated in *Brown v. Illinois*, 422 U.S. 590 (1975):

> If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. See Davis v. Mississippi, 394 US 721, 726-727, 22 L Ed 2d 676, 89 S Ct 1394 (1969).  Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving Miranda warnings.  Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words."  See Mapp v. Ohio, 367 US, at 648, 6 L Ed 2d 1081, 81 S Ct 1684, 84 ALR2d 933.

*Id*. at 602-603; *see also Dunaway v. New York*, 442 U.S. 200, 217 (1979).

The question that needs to be answered is "whether, granting establishment of the primary illegality, the evidence [the defendant's statements] to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  Guidance in answering this question is found in the Supreme Court's following admonition:

> The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case.  No single fact is dispositive.  The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test.  The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest.  But they are not the only factor to be considered.  The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see Johnson v. Louisiana, 406 US 356, 365, 21 L Ed 2d 152, 92 S Ct 1620 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant.  See Wong Sun v. United States, 371 US, at 491, 9 L Ed 2d 441, 83 S Ct 407.  The voluntariness of the statement is a threshold requirement.  Cf. 18 USC § 3501 [18 USCS § 3501].  And the burden of showing admissibility rests, of course, on the prosecution.

*Brown v. Illinois, supra* at 603-604.

However, even if it were assumed *arguendo* that the statements made by the defendant were not the product of "coercion," or that they were not obtained in violation of the defendant's rights under the Fifth Amendment to the United States Constitution, they are nevertheless inadmissible as evidence since they were obtained as a result of the violation of the defendant's rights under the Fourth Amendment to the

United States Constitution.  As the United States Supreme Court stated in *Dunaway v. New York*, 442 U.S. 200 (1979):

> But Brown v. Illinois, supra, settled that "[t]he exclusionary rule. . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth," 422 US, at 601, [45 L Ed 2d 416, 95 S Ct 2254], and held therefore that "Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation."  Ibid.
>
> "If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. . . .  Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving Miranda warnings."  Id., at 602, 45 L Ed 2d 416, 95 S Ct 2254.
>
> Consequently, although a confession after proper Miranda warnings may be found "voluntary" for purposes of the Fifth Amendment, this type of "voluntariness" is merely a "threshold requirement" for Fourth Amendment analysis, 422 US, at 604, 45 L Ed 2d 416, 95 S Ct 2254.  Indeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached.
>
> Beyond this threshold requirement, Brown articulated a test designed to vindicate the "distinct policies and interests of the Fourth Amendment."  Id., at 602, 45 L Ed 2d 416, 95 S Ct 2254.  Following Wong Sun, the Court eschewed any per se or "but for" rule, and identified the relevant inquiry as "whether Brown's statements were obtained by exploitation of the illegality of his arrest," 422 US at 600, 45 L Ed 2d 416, 95 S Ct 2254; see Wong Sun v. United States, supra, at 488, 9 L Ed 2d 441, 83 S Ct 407.  Brown's focus on "the causal connection between the illegality and the confession," 422 US, at 603, 45 L Ed 2d 416, 95 S Ct 2254, reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment.  When there is a close

> causal connection between the illegal seizure and the
> confession, not only is exclusion of the evidence more likely
> to deter similar police misconduct in the future, but use of
> the evidence is more likely to compromise the integrity of the
> courts.

*Id.* at 216-216 (footnotes omitted).

The temporal proximity between the time the police invaded the defendant's home and interrogated him and placed him under arrest and the interrogation by S.A. Fitzpatrick was, for all intents and purposes, of a relatively short duration.  There were no substantive intervening circumstances so as to cause the defendant's statements to be sufficiently attenuated so as to allow for their admission into evidence.  The close "causal connection" between the illegal entry and seizure of contraband and admissions to Officer Jaworski and the "repeated" statements made by the defendant to S.A. Fitzpatrick  mandate a finding that the statements should be suppressed as "fruits of the poisonous tree" resulting from the illegal search and arrest of the defendant in order to effectuate the rights and protections afforded by the Fourth Amendment.  *Wong Sun v. United States, supra.*

**Defendant's Motion To Dismiss The Indictment:**

The defendant asserts that "the government's delay in prosecuting this case has caused him to be "prejudiced" and therefore the indictment against him should be dismissed.  (Dkt. #6, p. 7).

The Fifth Amendment to the United States Constitution expressly provides in

part:

> No person shall be held to answer for a capital, or otherwise
> infamous crime, unless on a presentment or indictment of a
> grand jury, . . . , nor be deprived of life, liberty, or property,
> without due process of law. . . . (emphasis added).

It has been held that:

> [O]nly government conduct that "shocks the conscience" can
> violate due process.  *United States v. Chin*, 934 F.2d 393,
> 398 (2d Cir. 1991) (quoting *Rochin v. California*, 342 U.S.
> 165, 172, 72 S. Ct. 205, 96 L.Ed. 183 (1952). . . .  The
> paradigm examples of conscience-shocking conduct are
> egregious invasion of individual rights.

*United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999).

However, the Court of Appeals for the Second Circuit has also held that:

> An indictment brought within the time constraints of the
> statute may nevertheless violate due process where pre-
> indictment delay has been shown to cause 'substantial
> prejudice' to the defendant's ability to present his defense
> and 'the delay was an intentional device to gain [a] tactical
> advantage over the accused.' [*United States v. Marion*, 404
> U.S. 307, 324, 92 S. Ct. 455 (1971)].  As the Supreme Court
> further has explained, where delay prejudices the
> presentation of a defense and is engaged in for an improper
> purpose it violates the Due Process Clause because such
> conduct departs from the fundamental notions of 'fair play.'
> *United States v. Lovasco*, 431 U.S. 783, 795, 97 S. Ct.
> 2044, 52 L.Ed.2d 752 (1977).  A defendant bears the 'heavy
> burden' of proving both that he suffered actual prejudice
> because of the alleged pre-indictment delay *and* that such
> delay was a course intentionally pursued by the government
> for an improper purpose.  *See United States v. Scarpa*, 913

F.2d 993, 1014 (2d Cir. 1990); *United States v. Hoo*, 825
F.2d 667, 671 (2d Cir. 1987).

Prejudice in this context has meant that sort of deprivation
that impairs a defendant's right to a fair trial.  *See United
States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979).  This
kind of prejudice is commonly demonstrated by the loss of
documentary evidence or the unavailability of a key witness.
*See e.g. Lovasco*, 431 U.S. at 796, 97 S. Ct. 2044. . . .

*United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999).

I do not find anything in the present record that would support a finding

that the delay in indicting the defendant herein was caused so as to "gain a tactical

advantage over the accused" or that such delay has caused the "loss of documentary

evidence or the unavailability of a key witness."  As a result, it cannot be said that the

defendant's rights under the Due Process Clause of the Fifth Amendment have been

violated under those circumstances.

The Court of Appeals for the Second Circuit has clearly stated "that timely

brought criminal prosecutions are only rarely dismissed."  *Id.*  A defendant who claims

that his Constitutional rights under the Fifth Amendment to the United States

Constitution have been denied because of delay has

[t]he burden of demonstrating **actual prejudice**. . . and the
proof of prejudice must be **definite** and **not speculative.**
To sustain [his] burden of proof, the defendant **must**
"demonstrate how [the loss of evidence] is prejudicial" to
[him].  Without definite proof as to this **essential** element no
due process claim has been stated.

-36-

*United States v Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982) (alteration of "the loss of evidence" in original) (citations omitted) (emphasis added).

The Second Circuit Court of Appeals has described the aforesaid burden on the defendant as a "heavy" one in order "to sustain a claim of violation of due process." *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir.) *cert. denied* 444 U.S. 994 (1979).

The United States Supreme Court has expressly set forth the method of analysis that must be applied in determining whether a defendant has met his burden in establishing a claim of violation of due process based on delay.

> To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances in each case.

*United States v. Marion*, 404 U.S. 307, 324 (1971).

In a subsequent decision, the United States Supreme Court elaborated further on the issue wherein it stated:

> Thus Marion makes clear that proof of prejudice is generally a necessary but **not sufficient** element of a due process claim, and that the due process inquiry **must** consider the reasons for the delay as well as the prejudice to the accused.

> . . . [T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree

with a prosecutor's judgment as to when to seek an
indictment.

. . . From the perspective of law enforcement officials, a
requirement of immediate prosecution upon probable cause
is equally unacceptable because it could make obtaining
proof of guilt beyond a reasonable doubt impossible by
causing potentially fruitful sources of information to
evaporate before they are fully exploited.  And from the
standpoint of the courts, such a requirement is unwise
because it would cause scarce resources to be consumed
on cases that prove to be insubstantial, or that involve only
some of the responsible parties or **some of the criminal
acts**.  Thus no one's interests would be well served by
compelling prosecutors to initiate prosecutions as soon as
they are legally entitled to do so.

*United States v. Lovasco*, 431 U.S. 783, 790-92 (1977) (emphasis added).

As the United States Supreme Court admonished in *Lovasco*:

In our view, **investigative delay** is fundamentally unlike
delay undertaken by the government solely "to gain tactical
advantage over the accused," United States v. Marion, 404
U.S. at 324, 30 L.Ed.2d 468, 92 S.Ct. 455, precisely
because investigative delay is not so one sided
. . . We therefore hold that to prosecute a defendant
following investigative delay does not deprive him of due
process, **even if his defense might have been somewhat
prejudiced** by the lapse of time.

*Id.* at 795-96 (emphasis added).

In applying the principles established in *Lovasco*, the Court of Appeals for

the Second Circuit has stated:

As a general matter, a prosecutor is "justified in not seeking
the indictment until . . . convinced that there [will] be

> sufficient evidence to prove guilt beyond a reasonable
> doubt." *United States v. Rubin*, 609 F.2d 51, 66 (2d Cir.
> 1979), *aff'd*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633
> (1981).  Moreover, "[t]o establish denial of due process
> based on excessive pre-indictment delay [a defendant]
> bears the heavy burden . . . of showing not only that he was
> prejudiced by the delay but that **it was so unfair as to
> violate fundamental concepts of fair play and decency,
> such as would occur if the prosecutor deliberately used
> the delay to achieve a substantial tactical advantage.**"
> *Id.* (citing *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct.
> 2044, 52 L.Ed.2d 752 (1977)); *see also United States v.
> Ruggiero*, 726 F.2d 913, 925 (2d Cir.) (defendant "failed to
> show either actual prejudice or unjustifiable governmental
> conduct, such as deliberate delay to achieve a substantial
> tactical advantage"), *cert. denied*, 469 U.S. 831, 105 S.Ct.
> 118, 88 L.Ed.2d 60 (1984).

*United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990) (emphasis added).

In the instant case, the defendant has not presented any evidence to establish a claim that fundamental concepts of fair play and decency have been violated.  Nor has he presented anything to support a claim that the actions of the prosecutors in this case were based on a motive to obtain or achieve some form of tactical advantage by deliberately delaying the investigation and returning of the indictment.

Basically, the defendant is relying on the "**possibility** of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost."  However, in rejecting the "possibility of prejudice" under such circumstances, the Court of Appeals for the Second Circuit has expressly stated:

We must also reject the contention that during the interim
period witnesses' memories dimmed; that has not been
considered the sort of actual substantial prejudice that
predicates reversal for pre-indictment delay.

*Elsbery*, 602 F.2d at 1059.


In addressing a similar pre-trial claim of "actual prejudice," *i.e.*, "that

memories will dim, witnesses become inaccessible and evidence lost," the United

States Supreme Court has ruled as follows:


As we said in United States v. Ewell [383 U.S. 116, 122
(1966)] "the applicable statute of limitations . . .
            is . . . the primary guarantee against bringing
            overly stale  criminal charges."

\*   \*   \*

Appellees rely solely on the real possibility of prejudice
inherent in any extended delay: that memories will dim,
witnesses become inaccessible and evidence lost.  In light of
applicable statute of limitations, however, these
**possibilities** are **not** in themselves enough to demonstrate
that appellees cannot receive a fair trial and to therefore
justify the dismissal of the indictment.  Events of the trial
may demonstrate actual prejudice, **but at the present time**
appellees' due process claims are **speculative** and
**premature**.

*Marion*, 404 U.S. at 322, 325-26 (1971) (emphasis added).


At this stage of the proceedings, the defendant has merely claimed

prejudice due to delay but has failed to "demonstrate how [the delay] is prejudicial" to

him. "Without **definite** proof as to this essential element no due process claim has been

stated." *United States v. Birney,* 686 F.2d at 106 (emphasis added).

## CONCLUSION

Based on the foregoing, it is hereby recommended that defendant's

motion to suppress evidence be GRANTED and that his motion to dismiss the

indictment be DENIED.

It is hereby  **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the

Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be

filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this

Report, Recommendation and Order in accordance with the above statute,

Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments,

case law and/or evidentiary material which could have been, but were not presented to

the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v.*

*Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

DATED:      Buffalo, New York
            September 5, 2012

                              *S/ H. Kenneth Schroeder, Jr.*
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**